IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 26, 2017 at Knoxville

**STATE OF TENNESSEE v. JOSHUA ICEMAN**

**Appeal from the Criminal Court for White County**
**No. CR5205     David A. Patterson, Judge**

—————————

**No. M2016-00975-CCA-R3-CD**

—————————

The Defendant, Joshua Iceman, was convicted by a jury of aggravated child abuse and first degree felony murder, for which he received concurrent terms of eighteen years and life imprisonment, respectively. The Defendant appeals, arguing (1) that his statement at the hospital resulted from custodial interrogation given without proper <u>Miranda</u> warnings and, therefore, that statement should have been suppressed; (2) that the State experts' testimony on "shaken-baby syndrome and/or non-accidental trauma" was not sufficiently reliable to warrant its admission; (3) that the evidence was insufficient to support his convictions because the jury was faced with conflicting expert testimony; and (4) that the trial court erred in enhancing his sentencing term for his aggravated child abuse conviction above the minimum in the Class A felony range. Following our review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jeffrey A. Vires, Crossville, Tennessee, for the appellant, Joshua Iceman.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Philip A. Hatch and Caroline E. Knight, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
<u>FACTUAL BACKGROUND</u>

This case arose following the death of the eight-week-old victim while she was in the exclusive care, custody, and control of the Defendant. For these actions, the

Defendant was charged on September 13, 2011, with aggravated child abuse and first degree felony murder. See Tenn. Code Ann. §§ 39-13-202, -15-402.

## I. Motion to Suppress Hearing

Prior to trial, the Defendant filed a motion to suppress, arguing that his September 3, 2011 statement at Erlanger Hospital ("Erlanger") was obtained through custodial interrogation devoid of Miranda[1] warnings. A hearing was held on the motion.

Detective Chris Isom of the White County Sherriff's Office testified that, on September 3, 2011, he received a call from Erlanger that an infant, the victim, was possibly "shaken" and "might not survive." Detective Isom, along with Investigator Terry Hembree of the Thirteenth Judicial District's District Attorney's Office, travelled to Chattanooga to investigate. Upon arriving at the hospital that afternoon, the two men met with the doctors and nurses tending to the victim, who informed them of the victim's various injuries. Later that evening, Detective Isom, Investigator Hembree, and Investigator Carla Yates of the Department of Children's Services, interviewed both the victim's mother, Ms. Crystal Kipp,[2] and the Defendant, individually, in "an empty hospital bedroom." The victim's mother was questioned first, and after she left the hospital room, the Defendant was called into the room and questioned. The Defendant's interview began at approximately 7:37 that evening and, according to Detective Isom, lasted about an hour to an hour and a half. Detective Isom testified that, after the interview was completed, the Defendant left the hospital with family.

Regarding the circumstances of the interview, Detective Isom explained that, although the door was shut, it was not locked; that the Defendant sat on the couch "right next to the door"; that the Defendant was not handcuffed or shackled during the interview; and that the Defendant entered the room under his own volition. Furthermore, Detective Isom advised the Defendant that the interview was fact-finding in nature, specifically, that they "were just there to find out what had happened to" the victim. According to Detective Isom, he explained to the Defendant that the Defendant "was the one that would decide what questions he wanted to answer or did not want to answer" or, stated another way, that, if the Defendant did not want to answer a particular question, then they would not "go there."

Additionally, at the conclusion of the interview, the Defendant agreed to speak with Detective Isom again if the need arose. Moreover, Detective Isom described the interview as normal in tone and cordial in nature, although the Defendant did become

---

[1] See Miranda v. Arizona, 384 U.S. 436 (1966).
[2] Ms. Kipp had previously gone by the last name of Pauliott.

upset at one point when asked "some questions about specifics about the [victim's] injuries."

On cross-examination, Detective Isom agreed that, during the conversation, he stated to the Defendant that he "just want[ed]" the Defendant "to feel comfortable" while answering questions. The Defendant responded to Detective Isom's comment by stating, "I'm just . . . a little tore up still from this incident." The Defendant also informed Detective Isom that he had been awake for almost forty-eight hours. However, Detective Isom opined that, "from [the Defendant's] demeanor and from the way [the Defendant] was acting," the Defendant was "comfortable" during the interview.

When Detective Isom was asked if the Defendant was considered a "suspect" at the time of the interview, Detective Isom replied, "As I look back now, I would have probably considered everybody that I came in contact with a suspect and/or witness." Detective Isom acknowledged that the Defendant was never given <u>Miranda</u> warnings.

Detective Isom testified that, towards the end of the conversation, the Defendant was "upset" about the following: "[The Defendant] mentioned that he didn't like law enforcement and . . . specifically that he didn't like Investigator Hembree[,] and he made some sort of reference to the way his family had been treated." Additionally, Detective Isom confirmed that the Defendant asked during the interview if there was "any chance that [he was] going to get [his] cell phone back[.]"

On redirect examination, Detective Isom reiterated that, towards the conclusion of the interview, the Defendant got "frustrated . . . when asked about the findings the doctors had described[,]" but nonetheless, the Defendant indicated that "he would be willing to speak with [Detective Isom]" if additional questions arose. Detective Isom also testified that the Defendant "was the one that was closest" to the unlocked door and that neither he nor Investigator Hembree was wearing a uniform.

Regarding the Defendant's cell phone, Detective Isom confirmed that the Defendant had signed a "Permission to Search Form." This form was signed by the Defendant at 8:58 p.m., which was close to the end of the interview. Detective Isom also assented on recross examination that, while the Defendant's interview was not videotaped, there was an audio recording of the interview.[3]

---

[3] We note that neither a transcript of the Defendant's hospital interview nor the audio recording appear to be properly included in the record on appeal. In the technical record, two exhibits are attached to the Defendant's motion to suppress—Investigator Hembree's "Field Interview Report" summarizing the Defendant's interview (Exhibit 1), and a transcript of the interview (Exhibit 2). The trial court made the following observations prior to issuing its ruling on the suppression issue:

The Defendant also testified at the motion to suppress hearing. The Defendant stated that the officers approached him that day at the hospital and asked to speak with him, and they identified themselves as law enforcement. According to the Defendant, he felt like he "had to go talk with them" and did not "feel like [he] could just get up and leave at any time" while being questioned.

On cross-examination, the Defendant confirmed that he was driven to Chattanooga by the victim's mother's family members. The Defendant affirmed that he walked into and out of the hospital room voluntarily; however, according to the Defendant, he did not "sit right next to the door[.]" Moreover, the Defendant stated that he was unaware if the door was locked or unlocked during the interview, but he assented that he never asked to leave the hospital room at any time.

The Defendant agreed that, near the end of the interview, he gave permission to search his cell phone and that he conveyed his willingness to meet for a second interview. The Defendant confirmed that Detective Isom explained to him "that he was there to talk about what happened" to the victim, but the Defendant did not recall Detective Isom saying to him that it was his decision "what [he] answered and what [he] didn't want to answer[.]" According to the Defendant, Detective Isom was not yelling at him during the interview and was "[j]ust asking . . . questions[.]" The Defendant did not remember becoming "aggravated" during the interview "when confronted with the medical evidence."

The transcript of the interview reflects that, upon entering the room, the Defendant was asked, "[H]ow are you doing?" and he responded, "Pretty good." Detective

---

[T]here is a motion that's been filed by the [D]efendant and it's been referred to through the proceedings today. The filing of motions does not necessarily set an exhibit before a court, nor does it give the opportunity at appellate review . . . .

What I mean by that is the motion contains a couple of exhibits, but those exhibits have not been introduced today. . . . If the [D]efendant wishes for what he has marked as Exhibit Number 2, which is the transcript of the interview, be introduced today, he should ask for that[.]

Defense counsel replied by conceding his error and asking that the exhibits "be admitted into evidence." The trial court ruled, "When we finish then, [the transcript of the interview] will be marked as Exhibit Number 2 and you can find it in the clerk's file." Regarding Investigator Hembree's report, the trial court concluded that it amounted to hearsay and noted that it "had not been strongly referred to" during the suppression hearing, so it was not going to be admitted into evidence. At the conclusion of the hearing, a transcript of the Defendant's interview was "marked and entered as Exhibit 2." Nonetheless, the exhibit list, included in the appellate record as certified by the trial court clerk, provides, "Transcript of Interview was marked as exhibit 2 (listed in transcript)—but not introduced or [e]ntered during [m]otion [h]earing—therefore not sent." Given these unique circumstances, we will refer to the transcript attached to the Defendant's motion to suppress.

requested of the Defendant, "If you'll just take a seat." Investigator instructed, "Right there." The Defendant initially maintained that the victim's injuries likely occurred after a fall from the couch. The Defendant asserted that he laid the sleeping victim on the couch placing a "blanket around her" so she would not fall off. When he went into the kitchen to get something to eat, he heard a loud "thump." He returned to the victim to find her lying on the floor. However, the victim did not look injured according to the Defendant, so when she again fell asleep, he placed her in a swing. Between thirty minutes to an hour later, the Defendant checked on the victim and observed that she was breathing "weird." He began to rock her. The Defendant said that the victim stopped breathing "not too long . . . after," so he ran her to the nearby hospital.

At one point in the interview, the Defendant began to talk about how his grandmother "almost caused" him "to split up" with Ms. Kipp. He then stated, "I'd rather not get into that situation if you guys don't min[d]." Detective Isom responded,

> That's fine—that's fine. We're—we're here to talk about what you want to talk about. I want you to understand that. We're—you know—I may ask a question, but if you say I don't want to talk about that—that's fine. Okay. . . . [A]nd if you don't want to [g]o there—I don't want to go there.

The Defendant indicated his understanding to Detective Isom's comments.

At another point in the conversation, an unidentified female can be heard talking in the background discussing when a business or company opens and closes.

After the Defendant provided his version of events to the officers regarding the fall from the couch, he was told that the doctors did not think that the victim's injuries were consistent with his explanation. The Defendant then opined that the victim could have been injured when he was running with her to the hospital because she was "limp" and "flopping around the whole time[.]" The Defendant proclaimed, "I was just focused on getting her to the hospital. I think that it happened there because I've never shaken that baby, nor will I ever shake a baby."

Later in the interview, Investigator Hembree continued questioning the Defendant about the medical evidence, commenting that it did not support the Defendant's story. The Defendant remarked, "[H]ang on, there's no actual medical evidence saying that someone actually shook this—like—just vigorously shook this child." However, Investigator Hembree said, "Ah yeah there is," to which the Defendant replied, "[N]o because they don't know. . . . No. They don't know exactly how her—how she was moving whenever . . . I was running. They don't know." When Investigator Hembree continued to assert that the doctors did in fact know how the victim's injuries were received, the Defendant inquired, "[H]ow do they know?" Investigator Hembree

-5-

responded, "Because you've got bleeding in the brain," to which the Defendant countered, "Okay. Yeah and that can happen from any acute movement." The Defendant stated that he was becoming "irate" due to Investigator Hembree's accusations.

While again speaking with Detective Isom, the Defendant asserted,

[T]he doctors told us—told me to my face that any acute movement which is any type of fast movement that is not normally—like doesn't normally occur . . . . So I mean, me running—I mean I didn't have like a great hold on her—I mean I was—it was full force sprinting okay. There's a very good possibility that it could have happened then.

Detective Isom then asked, "When did they tell you guys something different? You know you said that they said acute movement at first and then someone told you something differently. When did that happen?" The Defendant replied, "Well one of the doctors told us acute movement—and the nurse told us vigorous shaking."

At the conclusion of the interview, the Defendant was asked if he had any questions for the officers, to which he replied in the negative.

Following Detective Isom's testimony and the introduction of evidence, the trial court denied the Defendant's motion to suppress. Thus, the State was permitted to use the September 3, 2011 hospital statement in its case-in-chief.

## II. Daubert/McDaniel Hearing

The Defendant also filed a pretrial "Motion to Conduct a <u>Daubert/McDaniel</u>[4] Hearing." The Defendant argued that expert testimony on "shaken-baby syndrome" or "non-accidental head trauma" or "abusive head trauma" was unreliable, submitting that an analysis of the five non-exclusive factors in <u>McDaniel</u> supported this assertion. A hearing was held.

First, we note that the Defendant does not now on appeal, nor did he at the hearing, challenge the qualifications of Dr. Annamaria Church as an expert in the field of "pediatrics and pediatric trauma" or Dr. Adele Lewis as an expert in the field of "forensic pathology." Indeed, their respective educations and training in these fields are extensive, as was established during voir dire.

---

[4] See <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993); <u>McDaniel v. CSX Transp., Inc.</u>, 955 S.W.2d 257 (Tenn. 1997).

Dr. Church stated that she was a general pediatrician, served as the Medical Director of the Child Protection Team at Erlanger, and had taught as an Associate Professor in the Department of Pediatrics at the University of Tennessee. Dr. Church asserted that, based upon her education, training, and experience as a general pediatrician, she was able to differentiate between non-accidental and accidental trauma to a child. According to Dr. Church, accidental trauma was accompanied by "a history that describes the accident," whereas with non-accidental trauma, the history given either did not "match the physical findings or [there was] no history" provided.

Dr. Church estimated that she saw "thousands" of children each year, which included children under the age of two that presented with subdural hematomas, retinal hemorrhages, broken ribs, metaphyseal fractures, and bruising on the neck. Dr. Church described her process for concluding that this constellation of symptoms amounted to a diagnosis of non-accidental trauma:

> So for each thing I try and find other explanations for and generally what I try and do is find that a child has not been abused, so subdural hematomas, I might think about various things that might explain it. And then again, through my history taking, through my physical exam and through data collected through lab or x-ray I'm able to narrow everything down and if I have a story that does not match the findings and I have no other possible explanation for the findings, then I make the diagnosis of non-accidental trauma.

Dr. Church testified that this process was "recognized and used . . . in the field of general pediatrics," and she further conveyed that "the topics of abusive head trauma/non-accidental trauma [were] generally accepted within the scientific community" in this country. Dr. Church affirmed her belief that "abusive head trauma and non-accidental trauma" were "a real diagnosis" and that such a diagnosis could be made "within a reasonable degree of medical certainty[.]"

Moreover, Dr. Church had access to "a listserv," which listed published and peer reviewed articles compiled by a group of professionals "interested in the field of child abuse and neglect" and provided a forum for discussion. Regarding the methodology of testing a "diagnosis of abusive head trauma and non-accidental trauma" due to shaking, Dr. Church stated that studies were conducted using various animal models "where that particular animal mimics the situation . . . of a small child" because it was not possible to perform tests on actual infants. Dr. Church further remarked that "computer models" had been "developed and generated" "where somebody put[] together hardware to simulate a baby." Based upon these models, doctors inferred "what kind of forces [were] going on in a baby." Furthermore, according to Dr. Church, reports had been gathered where

perpetrators confessed to shaking the child and that coincided with the "findings by the physicians of injuries involving abuse[.]"

Dr. Church conveyed her familiarity with "journal articles and studies that [had] been conducted regarding abusive head trauma, shaken-baby syndrome, . . . and non-accidental trauma[.]" According to Dr. Church, she would read the publication and determine whether she agreed with the publication's conclusion, which included discussing the conclusion with other experts. Additionally, these publications were subjected to peer review.

Dr. Church relayed her awareness of organizations that recognize a finding of abusive head trauma or non-accidental trauma. Specifically, Dr. Church testified that the American Academy of Pediatrics had guidelines for such a diagnosis and that the Center for Disease Control "put out papers on abusive head trauma" or shaken-baby syndrome. Additionally, Dr. Church confirmed that she made her findings independent of litigation; her primary concern being "making sure the child is safe and getting them back to health."

Defense counsel then cross-examined Dr. Church. First, Dr. Church confirmed that she had conducted training sessions on shaken-baby syndrome, abusive head trauma, or non-accidental trauma, but that she herself had not published any articles on the subject. Dr. Church was then presented with several articles on the topic refuting the validity of such a diagnosis. She testified that she was aware of the publications but that she did not agree with the publications' conclusions; for instance, she disagreed that an infant with a fatal head injury would not have immediate symptoms.

Dr. Church affirmed that the medical community was unable to precisely determine the minimum amount of force necessary to cause a subdural hematoma or retinal hemorrhaging in an infant through shaking, explaining that "there are so many variables involved that it's hard to develop an applicable force[,]" for instance, "how much skin, how much muscle, how exactly was that force applied, etc., etc." She clarified that the medical community could estimate the minimal force necessary to cause a subdural hematoma, explaining, "[s]o for instance . . . , bouncing a child or throwing one up in the air," is "not enough" nor "the correct height[] of forces to cause the injury." Moreover, according to Dr. Church, the vast majority of subdural hematomas in children are traumatic in nature; however, they can occur during the "birthing process[.]"

Dr. Adele Lewis testified that she worked as a forensic pathologist and was the Deputy Chief Medical Examiner for Metropolitan Nashville Davidson County. She said that she had performed approximately three thousand autopsies during her tenure with the Medical Examiner's Office, and that "probably over a hundred" of those were on children less than one year of age. Dr. Lewis had also testified as a forensic pathology expert in

Kentucky, Georgia, and Mississippi, as well as Tennessee. Moreover, Dr. Lewis had lectured in the area of forensic pathology and child abuse and had taught at two Tennessee medical schools about the findings of abusive head trauma and non-accidental trauma. Dr. Lewis agreed that professionals were "moving toward" a diagnosis of abusive head trauma or non-accidental trauma, rather than terming it shaken-baby syndrome.

Dr. Lewis described her process for performing autopsies and opined that her process was "consistent across the field of forensic pathology[.]" When asked how she made a conclusion of non-accidental trauma or abusive head trauma, Dr. Lewis stated that she relied upon her observations during the autopsy and the history provided. Furthermore, she utilized her skills, experiences, and training as a forensic pathologist, in addition to reviewing articles or case studies "in determining what types of things a person may look for in making a finding of abusive head trauma or non-accidental trauma[.]" She also was aware of case studies where perpetrators admitted to abusing the child and that admission was compared with the medical evidence. Dr. Lewis confirmed that there were journal articles and case studies that had been published on the topic and were subjected to peer review.

Dr. Lewis also stated her disagreement with the following proposition: "[B]ecause we do not have the ability to shake or abuse babies or infants, . . . a forensic pathologist or a doctor, an expert witness in those fields[,] cannot arrive at a finding" of non-accidental trauma or abusive head trauma as the cause or manner of death. In addition, she maintained that "[n]o other medical condition fully mimics all of the features of the shaking-impact syndrome" and that "[s]everal patterns of clinical and radiographic findings allow a definitive diagnosis." Furthermore, a diagnosis of abusive head trauma or non-accidental trauma was a generally accepted diagnosis in the profession of forensic pathology, according to Dr. Lewis. She also listed several organizations that recognized the diagnosis.

Dr. Lewis stated that finding an infant suffered a subdural hematoma, retinal hemorrhaging, rib fractures, and metaphyseal fractures was "fairly suggestive" of shaking, but without more, she could not conclusively diagnosis the infant with abusive head trauma or non-accidental trauma. However, a child under the age of one with those injuries would "raise [her] suspicion," so she would attempt to investigate further. Moreover, there had been occasions, according to Dr. Lewis, where an infant had presented with this constellation of symptoms, and she did not believe that the injuries occurred from abuse.

Dr. Lewis testified that her autopsy findings were made independent of litigation. In addition, Dr. Lewis opined that a finding of non-accidental trauma or abusive head

trauma was "a reliable scientific diagnosis" and could be made "within a reasonable degree of medical certainty[.]"

On cross-examination, Dr. Lewis was presented with an article "on fatal pediatric head injuries caused by short distance falls[.]" Dr. Lewis did not believe that the article was applicable because a majority of those cases involved older children.

The Defendant narrowed his argument at the conclusion of the hearing,

> So finally, you know, what I'm asking the . . . court to do, all I'm asking the court do is to . . . disallow expert testimony that the children were diagnosed with either shaken-baby syndrome or abusive head trauma or a non-accidental trauma. Just to prohibit that diagnosis alone.
>
> Now the State expert may testify that the children suffered a subdural hematoma and that the children suffered a retinal hemorrhage and they testify that in their opinion this combination is consistent with the act of vigorous shaking. But I'm asking that the court not permit them to use the term shaken-baby syndrome, abusive head trauma, non-[accidental] head trauma in order to bootstrap the crime that the State has to prove by masquerading it as this part of the medical [proof].

At the conclusion of the hearing, the trial court denied the Defendant's motion and permitted the testimony. Additionally, the trial court noted that Dr. Church could have been qualified as "an expert in the area of shaken-baby/non-accidental trauma/abusive head trauma."

*III. Trial*

A. <u>Circumstances Surrounding the Victim's Death</u>. Crystal Kipp, the victim's mother, testified that she started dating the Defendant in December 2010 and that she was two months' pregnant with the victim at that time. Ms. Kipp stated that she married the Defendant about four months later, although, according to Ms. Kipp, the ceremony was not legal. She described the Defendant's demeanor as "great" during her pregnancy, noting that he never missed a doctor's appointment. Ms. Kipp relayed that the victim was born on July 6, 2011, and that the Defendant was listed as the victim's father on her birth certificate. According to Ms. Kipp, the Defendant "claimed [the victim] as his own[.]"

Ms. Kipp confirmed that she was not immediately released from the hospital following the victim's birth because they found E. coli on Ms. Kipp's placenta. According to Ms. Kipp, the victim was given intravenous antibiotics as a preventive

measure "just to make sure that [the victim] wasn't going to get it." Ms. Kipp testified that "they had to wait forty-eight hours for two tests to come back to clear [the victim]" and that, when those were negative, they were allowed to leave the hospital. In addition, Ms. Kipp confirmed that she and the Defendant were required to watch a video on shaken-baby syndrome before leaving the hospital. She further described the video, "How to deal with babies and how to kind of prepare new parents for what they're like, that it is hard, but just try to keep your cool."

Ms. Kipp was asked to describe the "first few weeks" when they returned home after the victim's birth. She replied that those weeks were "[p]erfect. It wasn't, it was a piece of cake. She was perfect, our relationship was great, it couldn't have went better." She was asked to describe the Defendant as a father, to which she responded, "He was, couldn't ask for better. He was a hog, like I mean I wanted to hold her all the time and so did he."

About four weeks after giving birth, Ms. Kipp returned to work, working at Walmart for a brief stint. Thereafter, Ms. Kipp started working the second shift at S&S Precision on September 1, 2011, starting at 3:00 or 3:30 p.m. and ending at 2:00 a.m. The Defendant watched the victim while she worked.

Ms. Kipp returned home from work early the next morning on September 2, 2011, and later that day, the couple took the victim to Pizza Hut for lunch. While they were eating, Ms. Kipp took a picture of the victim on the Defendant's lap, and that photograph was entered into evidence. Ms. Kipp stated that nothing was "wrong with [the victim] at that time that [she] noticed[,]" and she described the victim as "[j]ust happy." According to Ms. Kipp, they left the restaurant and went to the barber shop, intending for the Defendant to get his hair cut. However, the couple became involved in a "heated" argument, so they left without the Defendant's getting a haircut and returned to their apartment. Ms. Kipp explained that the argument continued once back at the apartment and that she took off her wedding rings and placed them on the floor because she "was done with the relationship at that point." They argued until it was time for her to leave for work, according to Ms. Kipp. Ms. Kipp described the victim during this time as "[p]erfect, as usual[,]" "happy," and playful.

While Ms. Kipp was at work that evening, she exchanged text messages with the Defendant "asking how [the victim] was doing and . . . slowly trying to talk about what had happened previously with the argument." Ms. Kipp said that she received a text message from the Defendant 12:26 a.m. to go to White County Hospital because the victim was not breathing. She left work and immediately went to the hospital. Ms. Kipp was able to see the victim after a short time, describing, "[s]he seemed fine, I mean she seemed a little bit scared. She was moving her arms and kicking her legs, and you know, looking around and everything like she was alert." The victim was not intubated at that

time, according to Ms. Kipp. Shortly thereafter, the victim was "airlifted" to Erlanger in Chattanooga.

Ms. Kipp testified that, after her "conversations with the physicians," she talked with the Defendant. She asked the Defendant if "he had [the victim] around anybody," to which he replied in the negative. She also inquired about what had happened to the victim to cause her injuries. According to Ms. Kipp, the Defendant said,

> [S]he was a little bit fussy, so he gave her Benadryl and then fed her a bottle and she fell asleep, so he put her in the swing that was pictured, pulled the door to, went out to the living room for about an hour, went back in there to check on her, and she was not breathing.

Ms. Kipp testified that she stayed with the victim at Erlanger until the victim died at 9:46 p.m. on September 5, 2011.

Ms. Kipp confirmed that, while at Erlanger, she spoke with law enforcement and that the Defendant was also interviewed by the officers. She stated that she was "present when [the Defendant] left the meeting with law enforcement[,]" and she described his demeanor at that time as "really bubbly, confident, cocky almost."

On cross-examination, Ms. Kipp confirmed that she "had medical issues during [her] pregnancy" and that "there were issues" with the victim's delivery. Regarding the victim's delivery, Ms. Kipp relayed that, in addition to the E. coli infection, the victim's heart "wouldn't come off [] one ninety and they took her for a C-section." Additionally, Ms. Kipp testified that, "about a week to two weeks" before the victim's death, she was prescribed Benadryl for allergies. She further explained that the victim "was really snotty" and having "upper respiratory" troubles. Ms. Kipp confirmed that they took the victim to the doctor "[m]ore than once" for these issues. Furthermore, Ms. Kipp affirmed that, when the victim was seen by Cookeville Pediatrics around the beginning of August, a full body x-ray was performed, and no broken bones or fractures were discovered.

Ms. Kipp was asked to describe an incident when both she and the Defendant were home and the victim "fell off the side of an air mattress or rolled off the side of an air mattress." Ms. Kipp explained,

> That was shortly after she was born. I was is in the shower and I got out right away cause I heard [the victim's] crying and he said that she, he was sitting on the edge of the air mattress and she was too close to the edge and she rolled off.

According to Ms. Kipp, the victim appeared to be "fine," so they did not seek medical attention for this fall.

Ms. Kipp opined that she and the Defendant were diligent in seeking medical care for the victim. Ms. Kipp confirmed that, prior to victim's admission to the hospital, she never suspected the victim had any fractures or broken bones, the victim never showed "any limited range of movement[,]" and the victim never cried out after being touched.

Ms. Kipp stated that the victim "was stuffy and snotty" when she left for work on September 1, but Ms. Kipp did not "consider her as being sick[.]" Furthermore, Ms. Kipp agreed that Defendant was "hysterical" when she arrived at White County Hospital.

On redirect, Ms. Kipp acknowledged that she did not see what actually happened with respect to the air mattress incident because she was in the shower. Ms. Kipp then detailed an incident that occurred when she was working at Walmart. According to Ms. Kipp, the Defendant called her and "said that he was standing in the living room holding [the victim] on his arm . . . and she kicked off his stomach and she fell on her back side on the floor." Ms. Kipp stated that the Defendant was alone with the victim at that time. The Defendant, believing the victim might have been hurt, brought her directly to Ms. Kipp at work. Ms. Kipp "checked her out" and did not see any problems. Ms. Kipp also mentioned another incident that occurred while she was working at Walmart:

> I was at work again at Walmart, he didn't tell me this until I had got home, but he was changing her diaper in the crib and he had her too far down to the side of the crib and she didn't really like to be on her back, so she was kicking and she kicked the side of the crib and he said that her foot, her toes went back to almost her chin. . . . So he was worried about her right foot being hurt.

Ms. Kipp estimated that this incident occurred twenty-four days before the victim passed away. They also took the victim to the doctor on this occasion, and a full body x-ray was performed, according to Ms. Kipp. Ms. Kipp said that she "question[ed] those inciden[t]s now" where she "didn't before."

Mr. Kirk Selby testified that he lived in the same apartment complex as the Defendant and Ms. Kipp, which was located in White County. According to Mr. Selby, the Defendant came by to visit him around 6:30 or 7:00 p.m. on the evening of September 2, 2011, carrying the victim with him. When asked if "[a]nything appeared abnormal?", Mr. Selby said that the victim was "face down in the carseat." Mr. Selby stated that he did not notice anything else abnormal about the victim, noting that she "pretty much [slept] the entire time" they were there, and that her breathing appeared "normal." According to Mr. Selby, the Defendant left that evening around 8:00 p.m.

-13-

Ms. Rachel Lowery was also at the apartment complex on the evening of September 2, 2011. She was there to pick up her daughter, whose father lived in the complex. According to Ms. Lowery, the Defendant stopped by the apartment around 7:00 p.m. for a visit and had the victim with him. Ms. Lowery said that the victim, who slept "the whole time," "seemed fine" and "was breathing[.]" Ms. Lowery also found it "odd" that the victim was lying on her stomach in the carseat; however, the Defendant told Ms. Lowery that the victim "had back problems and that she was not on her belly." Furthermore, Ms. Lowery testified that the Defendant had been drinking, but he did not appear drunk and "seemed to be taking care of the baby from what [she] could tell." The Defendant "checked on [the victim] a lot" and "even put a [pacifier] in her mouth," according to Ms. Lowery. In addition, Ms. Lowery estimated that the visit lasted "[a]bout . . . forty-five minutes to an hour."

B. <u>Medical Evidence</u>. Registered Nurse Karla Cantrell testified that she was working at White County Hospital on September 2, 2011, continuing through the morning hours of September 3, 2011. Nurse Cantrell testified that she was called by "a registration clerk" that evening and "told that there was a man with a baby that wasn't breathing." She stated that she "went to the door" and that the Defendant handed her the baby. Nurse Cantrell estimated that this exchange occurred "between 12:00 and 1:00, 12:30, 1:00 in the morning."

Nurse Cantrell described the victim's condition at that time: "And you know, very, just what we call a floppy baby or really placid. No spontaneous movement, no respirations, kind of ashen in color." According to Nurse Cantrell, the Defendant, however, appeared "relatively calm." The Defendant told Nurse Cantrell "that they had been giving her Benadryl, that she had had a cold. . . . [S]he was in the swing and he gave her Benadryl and put her in the swing and went back and checked on her and she wasn't breathing." Furthermore, the Defendant did not appear to be "out of breath[,]" according to Nurse Cantrell. Nurse Cantrell took the victim "immediately back through the ER to [the] trauma room and . . . called a code since [the victim] wasn't breathing."

Ms. Jeanne Simpson was also working as a registered nurse at White County Hospital that evening. According to Nurse Simpson, she was sitting at the Nurse's Station around midnight when she saw the Defendant on the surveillance system walk into the hospital with the victim. While Nurse Cantrell went to meet the Defendant, Nurse Simpson called the emergency room doctor and respiratory therapist to the trauma room. Once in the trauma room, a cardiac monitor was attached to the victim, and a pulse oximeter was placed on the victim "to see what her oxygen level was." According to Nurse Simpson, the reading from the pulse oximeter was "really low," being at only seventy-three percent when it should optimally be above ninety-five. Nurse Simpson further explained that the victim was "breathing maybe two to four times a minute" but

that the "normal [rate] for an infant her age is something between thirty-two and [forty]-two." They decided to intubate the victim to assist her with breathing and were able to stabilize her, returning her heart to a "normal sinus rhythm[.]" Moreover, at that time, the victim's pupils were "reactive," and she was "having spontaneous responses," like moving her arms and legs, and appeared to be recognizing those around her.

After stabilizing the victim, Nurse Simpson went to speak with the Defendant. She asked the Defendant what had happened:

> He had told me that the infant was very fussy that night, he couldn't get her to quit crying, that she had seen her pediatrician earlier in the week for a rash and was prescribed Benadryl. He said that he thought maybe she was uncomfortable because of the rash, so he gave her a dose of Benadryl, estimated around 9:00 or 10:00 that night. Finally, got her to go to sleep. He put her in her infant swing, went back to check on her around 11:30 and found her not breathing.

When asked if she noticed anything "unusual" about the Defendant, Nurse Simpson replied that "[i]t was unusual that he didn't try to come back into the ER with [Nurse Cantrell]" and that he "[s]eemed kind of withdrawn . . . [f]rom the whole situation."

Later, after Ms. Kipp had arrived at the hospital, Nurse Simpson went to speak with the couple and "gave them an update" by telling them "what all [the medical professionals] did and what to expect once they came back to [the victim's] room." At this point, the Defendant was "a little tearful[,]" according to Nurse Simpson. She continued, "When they came back to see the baby, the interaction just wasn't, something just wasn't right."

On cross-examination, Nurse Simpson agreed that Benadryl was a respiratory depressant, meaning that giving too much can cause "respirations to not be adequate, can slow them down greatly." Nurse Simpson also confirmed that the victim was given "Ativan per the Life Force Crew" at 2:05 a.m. She explained, "[T]he Life Force Team were the ones that gave her the medication, because at this point she was moving her arms and legs and they did not what her to dislodge her intubation tube, which would compromise her airway and breathing" while en route to Erlanger. Ativan was also a respiratory depressant. Finally, Nurse Simpson confirmed that "there were no obvious injuries noted to [the victim]," although she clarified that they never fully addressed the victim.

Nurse Simpson was also questioned about her initial observation of the Defendant that "he was quiet [and] was not tearful or anxious[.]" Nurse Simpson estimated that, "at

-15-

least ninety-eight percent [of parents], if not a hundred, [were] tearful and anxious knowing the child [was] in distress."

On redirect, Nurse Simpson testified that it was "common" in head trauma cases for the individual to "level off" once intubated. She further explained that it was "also common for them to decline later" when "swelling occurs." In addition, Nurse Simpson clarified that, while Ativan is a respiratory depressant, the intubation let the victim continue to breathe.

Dr. Church testified at trial and, after providing her qualifications, was again qualified as an expert in "pediatrics and pediatric trauma." Dr. Church, as a member of the Child Protection Team at Erlanger, was called for a patient assessment because there was concern that the victim's injuries were caused by non-accidental trauma. Dr. Church testified that she encountered the victim in the intensive care unit, and the victim was intubated and sedated at that time and "had some obvious trauma to the head area." Furthermore, Dr. Church recalled "seeing bruises," noting visible bruises to the victim's forehead and ears.

Dr. Church stated that she obtained a patient "history" from the "intensivist" and that she later spoke with Ms. Kipp and the Defendant. The Defendant provided the following story to Dr. Church: "[T]he mom had gone to work around 2:30, 3:00. He had a friend over somewhere between 4:00 and 6:00 and then later on in the evening everything was fine. Baby had a little bit of a breakout rash, so he decided to give [a quarter teaspoon of] Benadryl." When asked if a quarter teaspoon was a reasonable dose for the victim, Dr. Church stated that, while she would not recommend giving Benadryl to an eight-week-old, the appropriate dose "would probably be somewhere between an eighth and a quarter of a teaspoon."

Dr. Church provided further details of the Defendant's version that he relayed to her:

> He told me that he put her down on her back on the couch and put, rolled a blanket kind of around her as a barrier so that she couldn't fall off the couch. He went into the kitchen and then he heard a noise, he thought it was the dog or cat. But then when he investigated the noise, he was that, that [the victim] was laying [sic] on the floor, he described sort of her back leaning up against the couch and her on the floor, and that she was awake and not crying, that she was moving her arms and legs normally.

> . . . .

-16-

. . . He told me at that point that he tried to get her to sleep and put her in the swing and she was sleeping in the swing and then about half hour, hour later he went to check on her and that's when he noticed that she was not breathing right and he said it sounded like she was congested.

Dr. Church then discussed her medical findings. She stated that the victim's head scan revealed "both subdural and subgaleal hematomas," "subarachonoid hemorrhaging," and a "cerebral edema" or brain swelling. Dr. Church maintained that these injuries resulted from "a major head trauma." The victim also suffered "extensive bilateral retinal hemorrhaging." Dr. Church noted that, while retinal hemorrhaging could be caused during a cesarean birth, it had never been recorded as lasting longer than four to six weeks. According to Dr. Church, the "number one reason" for retinal hemorrhaging in infants was "non-accidental trauma" or "abusive head trauma." She further opined that, "within a reasonable degree of medical certainty," a child with the victim's injuries would have developed "immediate symptoms," including respiration trouble. Moreover, according to Dr. Church, pneumonia was not present on the victim's chest x-ray.

Dr. Church stated that, "based on a reasonable degree of medical certainty," the Defendant's story about the victim's falling off "an eighteen-inch high couch" as the mechanism of injury was "not possible" and neither was the Defendant's "just running to the hospital" with the victim in his arms, in Dr. Church's opinion. She concluded that the victim's injuries were caused by "abusive head trauma" that occurred in close proximity to when the symptoms manifested themselves.

Dr. Church also testified that it was normal to give an intubated child Ativan if they are going to be transported in a helicopter. The amount of Ativan given to the victim was a little less than recommended dosage, according to Dr. Church.

On cross-examination, Dr. Church affirmed that there were other possible causes for the victim's injuries besides non-accidental trauma. For example, Dr. Church agreed that the victim suffered from acid reflux, which would have made her "more susceptible to a choking event" and that retinal hemorrhages can be associated with "blood clotting" and "metabolic disorders." She further noted her agreement that both Benadryl and Ativan were respiratory depressants.

In addition, Dr. Church agreed that the victim's chest x-ray was not "completely normal," showing moderate congestion in "the blood vessels within the air sac" and inflammation in the blood vessels. While Dr. Church assented that "microscopic infection" in the victim's lungs was possible, she was not "concerned with pneumonia" based upon her review of the victim's chest x-ray. Dr. Church also maintained that, "even with flagrant pneumonia," "[m]ost people will not have problems with oxygenation."

Finally, Dr. Church could not recall if "any coagulation testing was performed," but she did remember that the victim's "electrolytes were abnormal." Dr. Church admitted that she did not review the records from the victim's two pediatricians or "the mother's prenatal records." Dr. Church also assented that "[t]he first CT scan" indicated that "a global acute ischemic event" could not be ruled out.

On redirect, Dr. Church stated that she looked for other evidence as well that demonstrated that the victim had been abused. Here, according to Dr. Church, the victim's x-rays also showed "old rib fractures, old leg fractures, . . . a fairly new leg fracture," and an "older" arm fracture. "[W]ithin a reasonable degree of medical certainty," Dr. Church was able to conclude that the victim's head injuries, which were "[v]ery significant[,]" occurred from "[c]hild physical abuse."

During recross, Dr. Church confirmed that "no cultures were taken, no virology studies were done that could have shown infection[.]" Dr. Church agreed that the victim's calcium levels were "[v]ery slightly" low, but she opined that it was not significantly low enough to effect bone health. Additionally, "no testing for metabolic bone disease," which is a condition causing bones not to grow properly, was performed. However, she clarified, "I had enough information without doing any laboratory testing that this was not metabolic bone disease." In Dr. Church's opinion, the victim's "bones [were] completely healthy . . . [o]ther than the fracture sites." Nonetheless, Dr. Church concurred that her observation notes indicated that the victim failed to thrive, meaning that "she did not have adequate weight gain" for her age.

Dr. Lewis also testified at the Defendant's trial. She noted that, three weeks prior, she had been appointed as the Interim State Chief Medical Examiner. After providing her additional qualifications, Dr. Lewis was again qualified as an expert in the field of forensic pathology.

Dr. Lewis confirmed that she conducted the victim's autopsy on September 7, 2011. Dr. Lewis opined that, "within a reasonable degree of medical certainty," the victim's cause of death was homicide due to "multiple blunt force injuries." She explained that multiple blunt force injuries were "caused by the body striking an object or an object striking the body" or, "in cases of infant maltreatment," from shaking. During the autopsy, Dr. Lewis observed that the victim had a bruise on her head, bruises on both ears, bleeding underneath the scalp, "some bleeding in the back of her neck, "bleeding all over the brain," bleeding in the spinal cord, "extensive" retinal hemorrhaging, "global cerebral ischemic changes," bilateral rib fractures "that were in a state of healing," a scrape on her right foot, and "metaphyseal fractures, both legs[.]" Dr. Lewis concluded that the victim's injuries could not have been caused by falling from an eighteen-inch high couch, running with the victim, giving a quarter teaspoon of Benadryl, or having pneumonia.

Dr. Lewis described a metaphyseal fracture: "A metaphyseal fracture occurs when a child is shaken back and forth and the growth plate is very weak there and so a little chip or a little corner of that can come off." Moreover, "[b]ruising to the ears is an injury that's common in child abuse cases," according to Dr. Lewis. She also noted, "Some people claim that if a baby is shaken very, very hard, that they would have bleeding in the muscles of their neck, so that is a possibility." Furthermore, a subdural hemorrhage was consistent with blunt force injury or shaking, and extensive retinal hemorrhaging was "most indicative of inflicted head trauma or child abuse." Regarding the rib fractures, there were four on the victim's left side and two on her right, and the location of the fractures was "very suspicious for abuse," according to Dr. Lewis. Dr. Lewis further testified that the rib fractures were "at least seven or ten days old." There were also "some areas of pneumonia" in the victim's lungs "that were only visible microscopically[,]" but Dr. Lewis opined that the pneumonia "did not have any [e]ffect on her life."

On cross-examination, Dr. Lewis agreed that the victim had a coagulation study done before her death and that the results were "[v]ery slightly abnormal." Moreover, she assented that a "coagulation abnormality" could cause someone to bruise more easily. Although the victim's calcium level was low, Dr. Lewis explained that "[a] lot of times when people have head injuries they have abnormalities of their clotting and in their electrolytes." Additionally, Dr. Lewis stated that "there were changes indicative of shaking in the [victim's] spinal cord microscopically" and that the subdural hematoma indicted "that a very significant force was applied to her brain." Dr. Lewis confirmed that, ultimately, it was the swelling in the victim's brain that caused her death.

Dr. Lewis also explained that the "microscopic pneumonia" she found in the victim's lungs was "acute," meaning it was "one or two days old." However, Dr. Lewis maintained that, even if the victim presented at the hospital with pneumonia, it was not what killed her.

Dr. Lewis agreed that she noted the victim's length and weight as appropriate for her age. Dr. Lewis noted that the victim received a "great deal of fluid" while she was in the hospital, which could lead to weight gain.

On recross, Dr. Lewis concluded that victim's injuries were "perfectly consistent" with the Defendant's admission that he grabbed the victim by her shoulders and shook her. She also opined that the bruising to the back of the victim's head was from an "impact injury" and not from a bleeding disorder or a low calcium level. She testified similarly about the bruising to the victim's ears—that it was not caused by a bleeding disorder but by blunt force injury or "possibly pinching the ear." Finally, Dr. Lewis reiterated that the victim's subgaleal hematoma was indicative of "significant force" being applied to victim's head given the amount of bleeding present.

-19-

On redirect, Dr. Lewis agreed that the victim's "lung weight was abnormally heavy[.]" She again attributed this to the amount of fluids the victim received while in the hospital.

C. Investigation by Law Enforcement. Detective John Ford with the White County Sherriff's Office went to the couple's apartment while they were at the hospital and took some photographs of the scene and some measurements. Detective Ford photographed the first couch in the living room of the apartment, which was tan in color and also had an orange blanket on it. According to Detective Ford, measurements of the couch reflected a distance of "sixteen and a half, maybe seventeen inches," from "the top of the couch to the floor." Detective Ford also photographed where a section of the carpet in front of the couch had been removed by law enforcement. There was a second couch in the living room of the apartment, which Detective Ford also photographed and measured. The couch did not have cushions on it, and it measured "almost a foot tall" from the floor to the top of the couch.

Detective Isom testified at trial about the Defendant's interview at the hospital on September 3, 2011, providing similar details as he did at the motion to suppress hearing. Detective Isom again stated that, upon his arrival at Erlanger, he spoke with the nurses and doctors treating the victim "to have a basic understanding of what they felt the injuries were and what might have caused them." He also detailed the empty hospital room and the participants present. In addition, Detective Isom described the Defendant as "cooperative" during the interview.

When Detective Isom asked the Defendant about the events leading up to the victim's hospital admission, the Defendant "started off by saying it was mostly a perfect day, that [the victim] was . . . very happy and playing[.]" Detective Isom continued,

> [The Defendant] said that sometime that evening he had placed her on the couch. He had rolled up, I believe a blanket so she couldn't roll off the couch and he went into the kitchen. While he was in the kitchen, he claimed he heard a noise, a thud. At first he thought it was the dog or the car, because in his words they were still babies and still playing around. But then when he re-entered the living room, he [saw] that [the victim] had [fallen] off the couch. He said her back was like facing the couch, but she was not crying. Her arms were moving and he picked her up and rocked her, didn't think she was injured because she hadn't cried.
>
> . . . .

-20-

He said . . . that he rocked her. Eventually she went to sleep. He put her in a swing in the bedroom. He left the door open and then he went on the couch and he said he was texting and dosing in and out.

. . . .

He said about, what he thought was about thirty minutes after that, he got up to check on [the victim]. He said she was breathing weird. He began to cradle her. He said somewhere maybe twenty to thirty minutes after that she stopped breathing, so he ran to the hospital.

. . . .

He said it took about four or five minutes to run to the hospital.

. . . [H]e went in, he gave the baby to a nurse and he told me that he explained to them what had gone on that evening, that sometime during the evening she had gotten fussy, so he had given her about a . . . quarter [tea]spoon of Benadryl and then he explained to them that she had [fallen] off the couch.

Detective Isom then informed the Defendant that, according to medical personnel, the Defendant's explanation was not consistent with the victim's injuries. According to Detective Isom, the Defendant insisted that the victim's injuries either "occurred from when [the victim] had [fallen] off the couch or possibly when he was running to the hospital." When Detective Isom was asked if they "accused [the Defendant] of anything," he replied, "No . . . . [W]e just explained to him that the information he was giving us was inconsistent with what the doctors were telling us. He became upset and he told us that he would never shake the baby, that he would never do anything to injure the child." Detective Isom affirmed that none of the officers had previously asked or accused the Defendant of shaking the victim.

Furthermore, Detective Isom testified that he had retraced the route taken by the Defendant to White County Hospital while carrying the victim and that the route measured two-tenths of a mile. Detective Isom confirmed that he had walked the path himself, that he was not jogging or running but walking at "a quick pace[,]" and that it took him two minutes and fifty seconds.

On cross-examination, Detective Isom confirmed that the interview was audio-recorded. Detective Isom acknowledged that, during the interview, the Defendant "attributed the vigorous shaking statement to what the nurse [had] told him." The statement, in either written or audio form, was never admitted at trial.

-21-

On redirect, Detective Isom testified that they asked the Defendant and Ms. Kipp for permission to search their phones because they had made "references to texting" during their interviews. Detective Isom confirmed that the two phones were "collected . . . [that day] so that they could be investigated." The cell phones were eventually returned to the Defendant and Ms. Kipp.

The phone records of the Defendant's text messages were entered into evidence.[5] The Defendant sent the following text messages that evening, some to Ms. Kipp and some to another identified individual:

> 7:38 p.m.: "Sleeping she just ate about thirty minutes ago :) she been great";

> 11:20 p.m.: "Ok seriously can you please come over? I am freaking out right now its about [the victim]";

> 11:22 p.m.: "I have no idea I just need you to come over or something you are the only person I know that is up right now";

> 11:23 p.m.: "I can't explain it";

> 11:31 p.m.: "maybe im just freaking out I don't know im sorry for everything today the weird attitude and everything I would like to be friends with you but I am serious about [the victim]";

> 11:38 p.m.: "Ok she is asleep now not sure what was going on but I think she is fine now";

> 12:23 a.m.: "I don't think that I am worth the life given to me I feel as though everything dark around me is closing in and grasping my very being the sights I see and the thoughts I think are only judgement waiting to be passed I say the words as the tears drop down feel the emotions as the blood trickles through my life has no meaning my mind has no thought my heart has no beat these are the words of a soulless bastard thrown into the world head first the dying words of a meaningless man and the first breath of death as last the times I have had are but memories and the nightmares tred through my darkness is grasping me yet all I need is you n this was a poem I wrote when my mom passed away and it is something that it [sic] think about all the time I want nothing";

---

[5] It is unclear if the times for these text messages are given in Eastern or Central Time. We note that White County is located in the Central Time Zone, whereas Erlanger in Chattanooga is on Eastern Time.

-22-

12:41 a.m.: "I really need someone here right now but I don't want you to leave work";

1:56 a.m.: "Come to white county hospital she isnt breathing"; and

1:58 a.m. "No I am not F--king joking hurry and get to the hospital."

Later on September 3, 2011, the Defendant texted,

No I feel like its my fault she fell off the couch and stopped breathing about 2 hours after that and I ran to the hospital with her now we are at Erlanger and they think I purposely hurt her she has blood on her brain and behind her eyes which happens when the baby has been shaken so I think that the baby shaking syndrome happened while I was sprinting to the hospital.

The Defendant gave another statement on September 13, 2011—this time to Agent Dan Friel of the Tennessee Bureau of Investigation ("TBI"), which took place at the White County Sheriff's Office. After being properly advised of his Miranda rights and initialing each right, the Defendant signed a waiver of rights form and was interviewed by Agent Friel for approximately one hour and seven minutes. Agent Friel wrote down the details of the Defendant's statement, which the Defendant reviewed, marked through the mistakes, initialed the changes, and affixed his signature. According to Agent Friel, it was not TBI policy to record interviews, and he preferred the written method.

In this statement, the Defendant told Agent Friel as follows:

It was an accident, [the victim] was crying all night, and when [her mother] left to go to work [the victim] was still crying. I got upset with [the victim] and put her in her swing in the back bedroom. [The victim] was still crying, so I went on the balcony to cool off. I was out on the balcony for about [thirty] minutes, long enough to smoke two cigarettes, when I went back inside [the victim] was still crying. I was frustrated I did not know what to do to make [the victim] stop crying. I picked [the victim] up out of her swing and held her by her shoulders. I shook [the victim] and told her to stop crying. [The victim] still did not stop crying, so I put her back in her swing, and I left the room.

I went back in the room two hours later, and [the victim] was not breathing. . . . [The victim] was gasping for air. I tried CPR on [the victim] when it didn't work, I ran her to the hospital.

Agent Friel was also involved in the search of the couple's apartment. According to Agent Friel, the tan couch in the living room measured approximately eighteen inches high.[6] Agent Friel also explained that they removed a section of the carpet in front of the couch "just to show how thick the padding was on the carpet . . . that [the Defendant] alleged the baby fell onto." The piece of removed carpet was shown to the jury and entered into evidence.

D. <u>Defense Proof</u>. The Defendant presented one witness in his defense. Dr. John Spencer Daniel III, "a consultant in forensic medicine" since 1998, testified as an expert in forensic pathology. Dr. Daniel testified that he reviewed the victim's medical records "from birth until the time of admission on the 3rd of September, 2011[,]" her records from White County Hospital and Erlanger, "[a]ll of the x-rays related to those hospitalizations and previously[,]" the autopsy report and "the autopsy slides" prepared by Dr. Lewis, and the Defendant's statements. Dr. Daniel stated that the victim "died of brain swelling" and that the "primary things" to have considered in the victim's case as the cause of that swelling were "lack of oxygen, infection in the brain, or trauma to the brain." Moreover, Dr. Daniel explained that there "may be more room for the brain to swell" in an infant and, therefore, there may be "a period of time when the child is relatively normal before they manifest symptoms."

Dr. Daniel then described "reasons why the brain would not be receiving oxygen": "a heart problem so that the blood circulation isn't effective"; "a lung problem"; and "trauma to the brain." Daniel further testified that an aspiration event, such as "a spitting up event or a vomiting event[,]" could cause a child to "breathe some of that material into their airways, [and] they can choke and that choking can lead to deprivation of oxygen." According to Dr. Daniel, the victim was at risk for an aspiration event because she suffered from esophageal reflux. In addition, Dr. Daniel stated that it was possible for an infant to have an "apnea spell" that causes a lack of oxygen to the brain long enough to produce "some damage[,]" or for an infant to suddenly stop breathing, commonly referred to as Sudden Infant Death Syndrome.

Dr. Daniel stated that, although children usually did not get seriously injured from a fall off of an eighteen-inch high couch, if the victim "fell wrong on the top of head," then that might explain some of the bleeding in the victim's scalp, particularly if she had an abnormal blood clotting system. According to Dr. Daniel, there was "some evidence in the record" "to question [the victim's] blood clotting system[.]" Moreover, Dr. Daniel

---

[6] There was some discrepancy as to whether the couch measured "sixteen and a half, maybe seventeen inches," from "the top of the couch to the floor" as Detective Ford testified or whether it was eighteen-inches high as Agent Friel testified. To give the benefit of any doubt to the Defendant, we will use eighteen, the higher number.

stated that a fall from that height might cause the victim to "become somewhat dazed," which "would contribute to vulnerability for an aspiration event."

Dr. Daniel relayed that there was only "limited testing" done to determine if the victim's "coagulation system" was working properly, and what testing was done reflected "abnormal" results, so further testing was needed, in Dr. Daniel's opinion. Additionally, the victim's calcium level was low, which, according to Dr. Daniel, was "one sign that you may have a problem with . . . the clotting system that may lead to easy bleeding."

Dr. Daniel also wanted to correct the possible impression from Dr. Lewis's testimony that "there was only one tiny little microscopic area of abnormality" in the victim's lungs, remarking instead that multiple areas of "inflammatory cells" were present on the autopsy slides. According to Dr. Daniel, the victim's airway appeared "to be affected by inflammation[.]"

Regarding the victim's rib fractures, Dr. Daniel agreed that "in general there has been some trauma[,]" but when there are multiple fractures, "one important question is to try to ascertain whether or not the bones [were] normal to start with." However, adequate testing was not done in this case, according to Dr. Daniel, to determine if the victim had underlying bone problems. Moreover, Dr. Daniel was asked why the victim might have appeared happy earlier in the day on September 2, 2011, despite these ribs fractures, and he replied that "pathologic fractures, as opposed to traumatic fractures," were "much less likely to cause pain." Also, if the victim "had not yet . . . started weight bearing[,]" then that might explain her lack of pain, in Dr. Daniel's opinion. Finally, Dr. Daniel affirmed that adequate amounts of Vitamin D and calcium were necessary for proper bone health; however, the victim was not tested to determine if she had a Vitamin D deficiency.

On cross-examination, Dr. Daniel admitted that the victim's oxygen level was normal once she was intubated and that she did not have a fever, and these were "two things" a physician would look for "when determining whether or not a child has an infection such as pneumonia in the lungs." Dr. Daniel clarified that the victim did not have "active pneumonia" in her lungs.

Dr. Daniel further noted his agreement with Dr. Lewis's findings regarding the victim's physical injuries. Moreover, Dr. Daniel testified that he had only performed about fifty autopsies since 1997 and that none of those were on infants. According to Dr. Daniel, it was not "simple to make a list of injuries" associated with shaken-baby syndrome or abusive head trauma. However, he acknowledged that, in 2001, he testified in a separate case that it was, in fact, easy to make such a list.

Regarding the presence of metaphyseal fractures in the victim's legs, Dr. Daniel stated that he had changed his opinion since 2001 and that these types of fractures did not

only occur from the act of shaking. He agreed that rib fractures "or fractures of any kind can always possibly be from abuse" and that "cervical spine and neck" injuries, head contusions, ear contusions, subarachnoid hemorrhaging, subdural hematomas, subgaleal hematomas, cerebral edema, and retinal hemorrhaging were also seen in shaking situations. Concerning the victim's injuries to her spine and neck, Dr. Daniel stated that he could not determine for certain whether the injury resulted from "shaking or whether it was a force that was delivered at that point or whether it was a bleeding episode that was exaggerated by . . . an easy bleeding situation." Nonetheless, he agreed that the Defendant's story of shaking of the victim was a possible cause of the victim's death.

On redirect, Dr. Daniel stated that his opinion on shaken-baby syndrome had changed since 2001, asserting that he no longer believed it was "so cut and dry." According to Dr. Daniel, his opinion changed due to "a particular case" that he worked on while with the Medical Examiner's Office where a toddler developed a lethal head injury from a short fall. He stated, "At the time I was reluctant to believe that a short fall could cause that injury, would cause a lethal injury, because that had been what I had been taught." However, after speaking with a pediatric neurosurgeon about the case, his opinion changed. When asked if he was "the only doctor that . . . has come to that realization?", Dr. Daniel replied, "No, sir, there's considerable controversy about these issues."

On recross, Dr. Daniel admitted that there was no "single diagnosis" other than abusive head trauma that would account for all of the victim's injuries. He clarified that "[i]t would [require] multiple diagnosis."

E. Verdict and Sentencing. Following the conclusion of proof, the Defendant was found guilty as charged of aggravated child abuse and first degree felony murder. The trial court sentenced the Defendant as a Range I, standard offender to concurrent terms of eighteen years for the aggravated child abuse conviction and life imprisonment for the felony murder conviction, resulting in an effective life sentence. The Defendant appealed, and the case is now properly before this court.

ANALYSIS

On appeal, the Defendant presents the following issues for our review: (1) whether the trial court erred by refusing to grant the Defendant's motion to suppress; (2) whether the trial court properly admitted expert testimony on "shaken-baby syndrome and/or non-accidental trauma"; (3) whether the evidence was sufficient to support the Defendant's convictions; and (4) whether his eighteen-year sentence for aggravated child abuse was excessive. We will address each in turn.

## I. Motion to Suppress

The Defendant argues that the trial court erred by denying his motion to suppress his statement made to Detective Isom at the hospital because he was subjected to custodial interrogation without being advised of his Miranda rights. The Defendant avers that the following circumstances support this assertion: the approximately one-and-a-half-hour interview took place in a hospital bedroom, which was a location unfamiliar to the Defendant; that Detective Isom, Investigator Hembree, and Investigator Yates were all present in the room; that he was instructed to sit upon entering the room; that Detective Isom began the interview by telling him that they were merely on a fact-finding mission; that the questioning was "police dominated"; that he was considered a suspect at the time of the interview; and that he was never informed he could refuse to speak with the officers or terminate the interview at any time.

The State counters that the Defendant was not in custody at the time he agreed to answer the officers' questions, remarking that the interview was conducted in a hospital bedroom mid-evening; that the Defendant voluntarily entered and exited the room; that the interview was cordial; and that the Defendant was informed of the purpose of the interview and that he could refuse to answer questions. The State continues, even if the Defendant was in custody, the admission of the Defendant's statement at the hospital was harmless because he "gave a substantially similar story to other witnesses."

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.

Both the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution protect a person against compelled self-incrimination. The Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). "Pursuant to Miranda, custodial interrogation entails 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom

of action in any significant way.'" State v. Goss, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998) (quoting Miranda, 384 U.S. at 444). The protections provided under Miranda do not apply in every instance where a police officer questions a suspect; rather, these protections only apply "when the defendant is in custody and is subjected to questioning or its functional equivalent." State v. Walton, 41 S.W.3d 75, 82 (Tenn. 2001) (citing Rhode Island v. Innis, 446 U.S. 291 (1980)). "Absent either one of these prerequisites, the requirements of Miranda are not implicated." Id.

The test for determining whether a person is in custody to a degree that he would be entitled to Miranda warnings is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996). This determination is a "very fact specific inquiry." Id. To that end, our supreme court has supplied the following, nonexclusive, list of factors "relevant to that objective assessment":

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id.

At the conclusion of the motion to suppress hearing, the trial court determined that the Defendant was not in custody for purposes of Miranda. In so concluding, the trial court made extensive findings of fact and conclusions of law. The trial court first concluded that "this [was] a voluntary action on the part of the [D]efendant[,]" noting that the Defendant understood "exactly why it [was] that he [was] speaking with officers on that day and there [was] nothing in the record to indicate that there [was] any coercion, threatening, or promises being made." Then, utilizing the Anderson factors, 937 S.W.2d at 855, the trial court evaluated the totality of the circumstances:

> We take the totality of the circumstances and we find that there is a location which is not a police station, it is an open forum and the [D]efendant has entered that forum on his own with other family members

-28-

or those family members of the child's family. He has come to this room by himself. He has entered it to answer questions. He is told in what we know now to be a cordial, non-confrontational conversational interview that he can answer the questions which he wishes and he can get answers to the questions that he asks. Toward the end of the interview, it's clear that the [D]efendant is being confronted with the injuries that the child received and asked questions about how those may have been maintained by the child and he is having difficulty in answering those questions and chooses to become upset and the interview . . . comes to an end. It only comes to an end after the [D]efendant is asked if he would like to speak again with the officers, if they ask to speak if he would do that, he says he would.

Towards the end of the interview, he also agrees to allow the officers to have a cell phone for some period of time. He signs a permission to search . . . further showing the court that he is not challenging any of the activity that the officers are doing in terms of their investigation, knowing exactly what the investigation is.

. . . [T]he court does not have any indication that [the Defendant] is other than an intelligent young man, confronted with a very serious offense. No indication that he has any type of mental deficiency or any indication to the court that he would know anything other [than] he could stop questioning if he chose to, he could walk out of the room. . . . No reason to believe that the interview was overbearing his will in any way[.]

Finally, the trial court concurred "with the argument that the [S]tate . . . put forth as to time, duration, numbers in the room, how [the Defendant] comes, how he goes, restraints upon him and all those other things."

From our examination of the record, we conclude that the trial court properly denied the Defendant's motion to suppress because the Defendant was not subjected to custodial interrogation at the hospital. The Defendant was already at the hospital when he was approached and asked to speak with the officers. The interview began at 7:37 p.m. in a hospital bedroom and lasted approximately an hour and a half. The Defendant entered and exited the room voluntarily. The Defendant was asked to sit down upon entering, and Investigator Hembree merely provided the location. When the interview was over, he returned to family.

Detective Isom testified that he informed the Defendant that the purpose of the interview was to determine what had happened to the victim and that the Defendant was informed during the interview that he did not have to answer questions if he so chose. The interview consisted of mostly of fact-finding questions. Detective Isom further

testified that the Defendant sat on the couch closest to the unlocked door and that he was not restrained in any way while questioned. Moreover, according to Detective Isom, the interview was cordial in nature and normal in tone for the most part, and the Defendant appeared to be comfortable during the interview. The trial court accredited Detective Isom's testimony.

Also, the Defendant evinced a willingness to cooperate during the interview by signing a consent form allowing his cell phone to be searched and agreeing to a second interview if the need arose. There was no testimony that the Defendant was confronted with suspicions of guilt or evidence of guilt during the interview. The trial court considered the relevant factors in making its determination that the Defendant was not in custody at the time he made the statements, and the evidence does not preponderate against those findings. See, e.g., State v. Robert Eugene Crawford, Jr., No. E2012-00001-CCA-R3-CD, 2013 WL 4459009, at *10 (Tenn. Crim. App. Aug. 19, 2013) (concluding same when initial interview of the defendant took place at the hospital following a report of possible child abuse).

Even if we were to determine that the Defendant was subjected to custodial interrogation at the hospital and that the statement should have been suppressed as a result of the Miranda violation, the error would still be subject to harmless error review. See State v. Climer, 400 S.W.3d 537, 569 (Tenn. 2013). The erroneous admission of evidence obtained in violation of a defendant's Miranda rights is a non-structural constitutional error, see Climer, 400 S.W.3d at 569, and as such, the test is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008).

There was nothing particularly inculpatory in what the Defendant told Detective Isom at the hospital on September 3, 2011. He denied ever shaking the victim and attributed the "vigorous shaking" statement to what the nurse had told him. Moreover, the Defendant provided Dr. Church with a substantially similar explanation for the victim's injuries, i.e, that the victim fell off of a couch while the Defendant was in another room. Importantly, the Defendant later gave another statement to Agent Friel on September 13, 2011, and after receiving Miranda warnings, the Defendant admitted to shaking the victim because she would not stop crying. In light of the evidence as a whole, the error did not contribute to the guilty verdict. Accordingly, we agree with the State that any error in this regard was harmless beyond a reasonable doubt. See, e.g, State v. Thomas William Brown, No. M2013-02327-CCA-R3-CD, 2015 WL 445542, at *12 (Tenn. Crim. App. Feb. 3, 2015) (finding Miranda violation harmless beyond a reasonable doubt because the defendant later gave similar statements after receiving proper warnings and because "[t]here was nothing particularly inculpatory" about the statement).

-30-

## II. Expert Testimony

Next, the Defendant challenges the expert testimony on "shaken-baby syndrome and/or non-accidental trauma"[7] as failing to meet the criteria for admissibility of expert testimony set forth in McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997) and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. State v. Copeland, 226 S.W.3d 287, 301 (Tenn. 2007) (citing Brown v. Crown Equip. Corp., 181 S.W.3d 268, 273 (Tenn. 2005)). Rule 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 provides,

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703. It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987); see Brown, 181 S.W.3d at 275; State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002) (citations omitted).

---

[7] Before our discussion of the trial court's analysis of the expert testimony, we must note that the term "shaken-baby syndrome" was a term invoked by counsel at trial and not by the expert witnesses. The Defendant's witnesses did not testify that the cause of the victim's injuries was "shaken-baby syndrome." Instead, Dr. Church concluded that the victim's injuries were caused by "abusive head trauma" that occurred in close proximity to when the symptoms manifested themselves, and Dr. Lewis testified that the victim's cause of death was homicide due to "multiple blunt force injuries" caused by another person. In fact, Dr. Lewis agreed that professionals were "moving toward" a diagnosis of abusive head trauma or non-accidental trauma, rather than terming it shaken-baby syndrome. Our discussion infra addresses the Defendant's argument regarding "shaken-baby syndrome" even though the term is inexact under the circumstances.

In Daubert, the United States Supreme Court held that Federal Rule of Evidence 702 requires that a trial court "ensure that any and all scientific testimony . . . is not only relevant, but reliable." 509 U.S. at 589. Our supreme court, in McDaniel, set forth the following list of factors for determining the reliability of scientific evidence:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

955 S.W.2d at 265. Rigid application of these factors is unnecessary. Copeland, 226 S.W.3d at 302. Not all expert testimony will "fit" with these factors, thus, the exact considerations that may be appropriate will vary depending upon "the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony." Brown, 181 S.W.3d at 277.

The Defendant contends that expert testimony concerning "shaken-baby syndrome/abusive head trauma/non-accidental injury" fails to meet the criteria set forth in McDaniel, arguing that "the methodology of testing is inadequate; the potential rate for error is unknowable; and the hypotheses lack general acceptance in the scientific community." He further submits that testimony on the topic invades the province of the jury. The State replies that the testimony of both Drs. Church and Lewis was "necessary to substantially assist the jury to determine whether the [D]efendant's shaking the victim could cause the victim's injuries." According to the State, both doctors' testimony "established that shaken-baby syndrome, abusive head trauma, and non-accidental trauma are accepted with the medical field as proper medical diagnoses regarding an infant's injuries"; "many peer reviewed and published articles and case studies have found those diagnoses to be reliable"; and the testimony was "introduced for the primary purpose of proving a fact in question, not merely to bolster the credibility of the State's witnesses."

Here, at the conclusion of the Daubert hearing, the trial court held that expert testimony on "non-accidental head trauma or abusive head trauma or shaken-baby syndrome" was admissible. The trial court determined that the testimony satisfied the McDaniel factors:

> And in doing that then, the court is considering the . . . five non-exclusive factors which are discussed in McDaniel and they are . . . whether scientific evidence has been tested and the methodology with which it has been tested. It's clear before the court today that the evidence has been tested, the methodology with which it has been tested, in fact it's been tested to the

-32-

point that there is discussion that it is either good or it's not good. Both of that's been brought to the court's attention today. But there has been a lot of study with this and it began back with the study that's been brought to the court's attention in 1968, I believe may be the first one that the defense brings to the court's attention. So it's been well studied and the methodology has been well explained here today.

Dr. Church has given us a real understanding that studies have been with animal models, monkeys and lambs, computer models, mechanical models and studies with confessions and findings. So it's simple for the court to see that that has been met.

Whether the evidence has been subjected to peer review or publication, we have enough publication before the court today to see that it has been. Both sides have been discussed well.

And as we go on to number four, whether as formally required, the evidence is generally accepted in the scientific community. Both of the experts today have testified that it is and they have listed for the court the journals which accepted, that they accepted. One is thirty years in the business, the other is ten years in the business, but that they use the evidence and the journals and the things, medical evidence that has been studied as part of what they do.

The experts' research or the experts' studies in this field are done exclusive of litigation and that's important to the court also.

What the court must find is that the evidence will substantially assist the jury to understand the evidence and determine a fact in issue. And the court believes that it does. And it concludes that the methodology and princi[ples] underlying the scientific evidence are sufficiently trustworthy and reliable to be presented to the jury. . . .

The court is looking, as the [S]tate mentioned, it is to guard the jury from considering pure speculation and this is not. . . .

The McDaniel case indicates that it made it easier to l[e]gitimate conflicting views of experts for the jury's consideration. . . .

The court is not required to determine whether it agrees with the evidence. I'm not going to substitute my view for the jury's and the jury is going to be allowed to view l[egit]imate conflicting views about scientific

-33-

proof, which I'm sure there's going to be in this case. Well presented by the [D]efendant that there is certainly evidence to the contrary that the shaken-baby, the abusive head trauma, non-accidental head injury, there is some reason to believe that that may not be true, but that's not for this court. Because what <u>McDaniel</u> says is provided the evidence is scientifically valid, criticism of it and opposing views may be elicited on cross-examination . . . and be established by the [D]efendant's case. . . .

. . . The conflicting view . . . will be a strong cross-examination and possibly the introduction of evidence from another witness.

. . . .

For the things that I'm not concerned for is whether the potential rate of error is known. It cannot be known. It is as close to being known as what we can know without hurting children. That's not what the court is expecting, so that particular, and number five, that is possible in many other studies that are done and many other scientific proofs, a potential rate of error. All that is being done to determine these things, the court knows of no other efforts that are being made, other than what's been discussed here in the courtroom today. Seems as if it's been well discussed and the potential rate of error is not known. But I think there's been a real effort to know it and I'm not concerned for that as I make my findings today and the ruling I make.

The trial court adequately performed its gate-keeping function by thoroughly assessing the <u>McDaniel</u> factors. <u>See</u> <u>State v. Scott</u>, 275 S.W.3d 395, 401 (Tenn. 2009) ("Trial courts act as gatekeepers when it comes to the admissibility of expert testimony.") (citations omitted). Moreover, the trial court correctly noted that, in making its admissibility determination, it was not empowered to choose between legitimate competing expert theories, and that the task must be left to the trier of fact. <u>Id.</u> at 404 (citations omitted).

The Defendant challenges only the reliability of the expert testimony given by Drs. Church and Lewis; he does not quarrel with their qualifications as experts in the fields of "pediatrics and pediatric trauma" and "forensic pathology," respectively. We have little difficulty in concluding that Drs. Church and Lewis were qualified to give an expert opinion regarding "non-accidental head trauma or abusive head trauma or shaken-baby syndrome." <u>Cf.</u> <u>State v. Demarkus Montreal Taylor</u>, No. M2016-00255-CCA-R3-CD, 2017 WL 781733, at \*4-6 (Tenn. Crim. App. Feb. 28, 2017) (offering an example in a felony murder and aggravated child abuse case where Dr. Lewis testified as an expert in forensic pathology), <u>perm. app. denied</u> (Tenn. May 18, 2017); <u>State v. Monica Dawn</u>

Hammers, No. E2015-00464-CCA-R3-CD, 2016 WL 4054090, at *6 (Tenn. Crim. App. July 26, 2016) (providing an example of Dr. Church's testifying, in an attempted aggravated child abuse case, as an expert witness in the field of pediatric medicine), perm. app. denied (Dec. 14, 2016). "Tennessee courts have widely accepted expert testimony regarding child abuse and accidental versus non-accidental trauma." State v. Calvin Jones, No. W2013-00881-CCA-R3-CD, 2014 WL 3778511, at *15 (Tenn. Crim. App. July 31, 2014) (approving testimony by expert in the field of child abuse pediatrics focusing on the physical injuries of the child victim and how they were caused) (citing State v. Marie Delaluz Urbano-Uriostegui, No. M2012-00235-CCA-R3-CD, 2013 WL 1896931, at *6, *14-15 (Tenn. Crim. App. May 6, 2013); State v. John Barlow, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *3-5 (Tenn. Crim. App. Apr. 26, 2010); State v. Russell Lee Maze, No. M2004-02091-CCA-R3-CD, 2006 WL 1132083, at *3-6 (Tenn. Crim. App. Apr. 28, 2006); State v. Andrew Neal Davis, No. M2002-02375-CCA-R3-CD, 2004 WL 1562544, at *6-7, *13-15 (Tenn. Crim. App. July 9, 2004)). We see no reason to depart from this trend in the current case. See Jones, 2014 WL 3778511, at *15; see also Futrell v. Commonwealth, 471 S.W.3d 258, 286 (Ky. 2015) (finding no abuse discretion under Daubert criteria by allowing expert to opine that the injuries suffered by the victim were inflicted and not accidental—that the child had been violently shaken or that his head had either been slammed against a hard surface or forcibly struck with a hard, blunt object); Wolfe v. State, 509 S.W.3d 325, 334-41 (Tex. Crim. App. 2017) (holding that opinion testimony of State's three experts on subject of abusive head trauma and whether victim's injuries were caused by intentionally inflicted impact was sufficiently reliable to be admissible); State v. Richard W. Gaver, No. 2015CA00204, 2016-Ohio-7055, 2016 WL 5610107, at *4-8 (Ohio Ct. App. Sept. 26, 2016) (finding no "legitimate concern of scientific invalidity " regarding expert's shaken-baby syndrome diagnosis, noting that "[t]his was not the type of junk science that lacked the intellectual rigor required for the admission of expert opinion").

The Defendant also argues that expert testimony on this topic invades the province of the jury. However, his reliance on State v. John Claude Wells, III, No. 01C01-9505-CR-00146, 1997 WL 311924 (Tenn. Crim. App. June 6, 1997), in support of this proposition, is misplaced. In Wells, the trial court permitted a non-expert witness, the victim's teacher, to describe the victim's erratic behavior at school and how that behavior prompted the investigation into the defendant; however, the victim's teacher was not allowed to offer an opinion or conclusion as to why the victim engaged in the conduct. 1997 WL 311924, at *6-7. According to the Defendant, the Wells court held

> that child sex abuse may not be proven by evidence the victim exhibited residual characteristics or behavioral traits similar to other victims of such abuse, as this type of evidence "invades the province of the jury" to decide on the credibility of witnesses; [and] that child sex abuse may not be

-35-

proven by evidence the victim exhibited residual characteristic or behavior traits similar to the victims of such abuse, citing State v. Ballard, 855 S.W.2d 557, 561-62 (Tenn. 1993), and State v. Anderson, 880 S.W.2d 720, 730 (Tenn. Crim. App. 1994).

The Defendant is correct that Ballard and Anderson convey the following legal tenets:  first, that the appellate courts have held testimony detailing behavioral dynamics of child abuse cases is inadmissible, see Ballard, 855 S.W.2d 557, 561-63; and second, that "child sex abuse may not be proven by evidence that the victim exhibited residual characteristics or behavioral traits similar to other victims of such abuse," see Anderson, 880 S.W.2d at 730.  Nonetheless, the Wells court declined to apply these tenets in that case, concluding instead that the testimony was admissible:

> This case is distinguishable upon the facts from the aforementioned cases.  Pounds was the victim's teacher from March 1990 when he entered the school until the spring of 1992.  She testified how the child acted at the school and how this prompted the investigation into the defendant.  The witness did not testify as to generalizations.  Instead, she testified to specific incidents.
>
> The witness was not offered as an expert.  More importantly, her testimony was not offered to show that the child's actions conformed with the type of behavior expected from a victim of child abuse.  She did not testify as to how child abuse victims act.  Her testimony was relevant to show jurors what prompted the investigation into the defendant's possible sexual abuse of [the victim].  Her testimony was relevant to show how the child acted during the period of abuse.  As previously stated, the witness was prohibited from offering opinions or conclusions that the child's behavior was indicative of abuse.

1997 WL 311924, at *7.  The holding of Wells does not afford the Defendant relief.

Similarly, the State's experts in this case did not testify about the victim's behavioral traits or common characteristics of abused children, and their testimony was not merely to bolster the credibility of other State's witnesses.  Rather, Drs. Church and Lewis testified about the specific physical injuries the victim sustained and opined about their cause.  This court has held that such expert testimony is assistive to the jury in making an inquiry into whether the crime of child abuse has taken place.  See Jones, 2014 WL 3778511, at *15.

Furthermore, as noted by our supreme court,

> The party proffering expert testimony need not establish that the expert testimony is correct, only that the expert testimony "rests upon 'good grounds.'" Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998) (quoting Daubert, 509 U.S. at 590); see also In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994); Burley v. Kytec Innovative Sports Equip., Inc., 737 N.W.2d 397, 406 (S.D. 2007). Where such a foundation exists, even if the trial court is of the view that there are better grounds for an alternative conclusion, the proffered expert testimony "should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." Ruiz-Troche, 161 F.3d at 85.

Scott, 275 S.W.3d at 404. The Defendant in this case did just that at trial. Through rigorous cross-examination of the State's experts, the defense explored medical issues favorable to its position. Additionally, the Defendant presented his own competing medical expert. Accordingly, we conclude that the trial court properly exercised its discretion in allowing Drs. Church and Lewis to testify as experts regarding the cause of the victim's injuries.

### III. Sufficiency

The Defendant asserts that the jury's verdict convicting him of aggravated child abuse and first degree felony murder was not supported by the weight of the evidence. After stating the pertinent standard of review, the Defendant's entire sufficiency argument is as follows:

> In the case sub judice, a combination of conflicting testimony by medical experts, in addition to questions raised regarding the circumstances surrounding a written statement purported to be given by the Defendant, combine to create a set of facts from which no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The State replies that the evidence was sufficient to support the jury's verdict, noting that the Defendant admitted to shaking the victim and that "the State's experts testified that the shaking caused the victim's injuries and death." The State further sets forth the legal adage that it was within the jury's province to accredit the State's experts over the Defendant's expert.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

To obtain a conviction for first degree felony murder in this case, the State was required to prove the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse[.]" Tenn. Code Ann. § 39-13-202(a)(2). The State need not show that a defendant intended to kill but only that he intended to commit the underlying felony. Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956). As relevant to this case, "[a] person commits the offense of aggravated child abuse . . . who commits child abuse, as defined in § 39-15-401(a)[, . . .] and . . . [t]he act of abuse . . . results in serious bodily injury to the child[.]" Tenn. Code Ann. § 39-15-402(a)(1). Section 39-15-401(a) defines child abuse as "[a]ny person who knowingly, other than by accidental means, treats a child . . . in such a manner as to inflict injury[.]" Tenn. Code Ann. § 39-15-401(a). The aggravated child abuse statute provides that

> "[s]erious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

Tenn. Code Ann. § 39-15-402(d). When the victim of aggravated child abuse is eight years of age or less, the offense is elevated to a Class A felony. Tenn. Code Ann. § 39-15-402(b).

The Defendant's sufficiency argument is simply that, because there was "conflicting testimony by medical experts," his convictions cannot stand. First, we reaffirm our conclusion in the previous section that the trial court properly permitted Drs. Church and Lewis to testify that the cause of the victim's injuries and subsequent death was "non-accidental head trauma or abusive head trauma or shaken-baby syndrome." Next, we affirm that the trier of fact determines the weight given to scientific theories and the resolution of competing scientific views. McDaniel, 955 S.W.2d at 265 (citation omitted). A rational trier of fact could have accredited the testimony of Drs. Church and Lewis, and we will not disturb the jury's conclusion in this regard.

The Defendant also asserts that questions were "raised regarding the circumstances surrounding a written statement purported to be given by the Defendant." The only written statement of the Defendant was given to TBI Agent Friel at the White County Sheriff's Office on September 13, 2011. Prior to speaking with Agent Friel, the Defendant was properly advised of his Miranda rights. On appeal, the Defendant makes no mention of what "questions [were] raised regarding the circumstances surrounding" this statement nor does he cite to any authority in support of his argument. We decline to speculate on what circumstances to which the Defendant is referring. While a motion to suppress this statement was filed in the trial court, a notation on the motion, signed by the trial judge, reflects that the motion was "withdrawn in open court" on October 3, 2013, and that the Defendant was "in agreement" with this decision. Defense counsel,[8] later, filed a second motion to suppress, challenging the Defendant's statement at the hospital.

Because the Defendant did not raise any issue surrounding the circumstances of his written statement in the trial court, and because he does not cite to the record or any legal authority in support of his argument on appeal, any issue with his written statement is waived. See Tenn. R. App. P. 27(a)(7); Tenn. R. App. P. 36(a); Tenn. Ct. Crim. App. R. 10(b). Once the statement was admitted into evidence, it was the jury's function to consider the truthfulness of that statement, including an assessment of any evidence of the circumstances under which the confession was procured. State v. Burns, 29 S.W.3d 40, 48 (Tenn. Crim. App. 1999) (There is a "longstanding rule in Tennessee that once a confession is admitted into evidence, a jury may hear evidence concerning the circumstances under which the confession was procured in order to determine whether the defendant made the confession and whether it is true."); State v. Pursley, 550 S.W.2d 949, 950 (Tenn. 1977) ("[T]he jury's purpose 'is to determine whether defendant made

---

[8] This second motion was filed by substitute counsel after the public defender's office was allowed to withdraw from the Defendant's case.

the confession and whether the statements contained in it are true. To aid them in resolving these questions the jury may hear evidence of the circumstances under which the confession was procured.'") (citing Wynn v. State, 181 S.W.2d 332, 333 (Tenn. 1944)).

The proof in the light most favorable to the State established that the Defendant, in a written statement to Agent Friel on September 13, 2011, admitted grabbing the victim by the shoulders and shaking her. He also stated to Agent Friel that he placed the victim in the swing for two hours before he noticed that she had stopped breathing and sought medical treatment. However, Dr. Church opined that the victim would have exhibited immediate symptoms from her injuries. Additionally, the Defendant stated to Det. Isom at the hospital on September 3, 2011, that he would not shake the victim, although none of the officers had accused the Defendant of shaking the victim at that point. Plus, Dr. Church, an expert in pediatrics and pediatric trauma, opined, within a reasonable degree of medical certainty, that the victim's injuries, and ultimate death, resulted from abusive head trauma. Dr. Lewis, a forensic pathologist, performed the victim's autopsy and concluded that the victim died from multiple blunt force injuries caused by another person. Dr. Lewis further stated that the Defendant's admission that he shook the victim was consistent with the injuries observed.

Additionally, the victim was solely in the Defendant's care in the hours before her arrival at the hospital, and prior to being left alone with the Defendant, the victim had no visible injuries and was behaving normally. Finally, the Defendant had previously been required to watch a video on shaken-baby syndrome. The evidence, we hold, was legally sufficient to support the felony murder and aggravated child abuse convictions. See, e.g., Jones, 2014 WL 3778511, at *11-12 (holding that the evidence was sufficient to support aggravated child abuse and felony murder convictions because there was ample circumstantial from which the jury could infer the defendant's guilt—the defendant was alone with the victim for a period of time on the evening question; the victim appeared "normal" and "playful" prior to that time; forensic pathologist opined that the victim's cause of death was multiple blunt force injuries caused by repeated episodes of compressive force; the defendant stated to police that he repeatedly hit the victim with his fist and a shoe while he held her on the ground; and the State's child abuse pediatrics expert testified that the victim's injuries were consistent with the defendant's statement); Maze, 2006 WL 1132083, at *15-17 (concluding that the evidence—the victim, who had been in the defendant's care, arrived at the hospital comatose with severe and life-threatening injuries; the defendant admitted to shaking his son, although he insisted that the shaking was not violent; and the State's expert testified that abusive, inflicted head trauma as the only medically reasonable explanation for the victim's injuries—was sufficient to support convictions of aggravated child abuse and felony murder despite testimony from the defense's expert witness attempting "to persuade the jury that the

victim's death was attributable to fatal liver disease, brain damage from Hepatitis B vaccine, and/or deterioration in the victim's diaphragm"). In light of these examples, we similarly conclude that the evidence is sufficient to support the Defendant's convictions for aggravated child abuse and felony murder.

## IV. Sentencing

The Defendant argues that his eighteen-year sentence for aggravated child abuse is excessive. Specifically, he submits that, "[g]iven the facts presented at trial and during the sentencing hearing, and taking into account the principles of sentencing . . . , the sentence imposed should not have exceeded" fifteen years. The State argues that the trial court did not abuse its discretion in sentencing the Defendant to a within-range sentence "due to the [D]efendant's treatment of the victim and his abuse of a position of trust as the victim's caretaker."

Before a trial court imposes a sentence upon a defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012).[9] Moreover, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2007). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In accordance with the broad discretion now afforded a trial court's sentencing decision, "misapplication of an enhancement or mitigating factor does not invalidate the

---

[9] Citing Tennessee Code Annotated section 40-35-401(d) and State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999), the Defendant states that our review is "de novo . . . with a presumption that the trial court's determinations are correct if the record shows the trial judge considered the sentencing principles and all relevant facts and circumstances." However, our supreme court in Bise specifically stated, "[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." 380 S.W.3d at 707.

sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). Carter, 254 S.W.3d at 344.

In this case, the Defendant, as a Range I, standard offender convicted of a Class A felony, was subject to a sentencing range of fifteen to twenty-five years for his aggravated child abuse conviction. See Tenn. Code Ann. §§ 39-15-402(b), 40-35-112(a)(1). In asserting that his sentence is excessive, the Defendant claims that the trial court "placed greater emphasis on the enhancement factors than was appropriate under the specific facts of this case, resulting in an inequitable sentence." He again notes the conflict in expert testimony: "[T]he evidence presented at trial showed a conflict between the State's and the Defendant's experts as to whether the child's injuries were resultant from a lack of oxygen to the brain caused by pneumonia or other medical reason not arising from child abuse." As additional favorable considerations, the Defendant cites from the presentence report that he was "without a prior significant criminal record; he had prior military service; and he had been diagnosed with an adjustment disorder." He reiterates that "[h]is age and education were also appropriately considered as mitigating factors." Finally, as evidence of excessiveness, the Defendant mentions that "[t]he sentence imposed by the trial judge exceeded the State's recommended sentence in terms of length of confinement."[10]

In issuing its decision to enhance the Defendant's sentence above the minimum, the trial court reasoned as follows:

> So the court in making its determination of the sentence considers the circumstances of the offense; the criminal record of the [D]efendant; the social history as stated in the presentence report . . . ; his physical and

---

[10] At the sentencing hearing, the prosecutor argued that only enhancement factor (10)—the Defendant had no hesitation about committing a crime when the risk to human life was high—applied to the Defendant and asked that the trial court impose a seventeen-year sentence. See Tenn. Code Ann. § 40-35-114(10). The trial court declined to apply factor (10). Regardless, the Defendant has not provided this court with any authority, and we know of none, that the trial court may not sentence beyond the recommendation of the State. Cf. Tenn. R. Crim. P. 11(c)(1)(B) (in a plea agreement situation, the defendant agrees to plead guilty with a recommended sentence from the State, but the State's recommendation is not binding upon the trial court).

mental health, which has been [al]luded to by his attorney and is in the report.

One of the other things is the deterrence value of the sentence that is received as to this defendant. . . . [T]he [C]lass A felony that we're sentencing is . . . a very serious crime that the court would like to show or would like to demonstrate to the community that it is serious.

. . . .

. . . 40-35-114 causes the court to look at those enhancement factors and then it looks at the mitigators in determining the length of the sentence.

Number one, the [D]efendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Well there is one. It's not of great concern to the court and it's not considered, the court does not give it great weight. But it gives it some weight. It's a traffic offense and the court knows that. But there is one.

The second one that the court looks at and gives great weight to is number five, the [D]efendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. One may commit an aggravated child abuse, cause injury to a child which does not cause death. This caused death and I don't know of a greater injury that can be . . . brought upon another person. And so it is considered and given weight and given great weight by the court. Number five.

Then number fourteen is a position of trust. It is not the [D]efendant's child, that was the proof that we heard. The [D]efendant began his relationship with the mother of the child after the child was born. It was testified [to] that he treated the child well until this particular event. But he was a caretaker of the child while the mother worked. And number fourteen is he abused that position of private trust and it facilitated in the commission or the fulfillment of the offense. He's with the child at all times basically or when the mother is not. And the court finds that to be an enhancement factor and gives that great weight also.

The court looks to the mitigating factors and does consider the [D]efendant's age, his lack of prior serious offenses or any which are offenses other than against government. His prior military service, that is credited to him. That he has an adjustment disorder, that he has some

-43-

mental difficulties. And those other issues that are brought [out] in the presentence report and that are brought to the court's attention by the attorney.

First, we note that the Defendant makes no real argument that the trial court improperly applied any of the enhancement factors it considered. In applying enhancement factor (1), the trial court stated that it did not "give it great weight" but did give "it some weight." The testimony of the presentence investigation officer showed that the Defendant was facing a charge of simple assault, occurring after he was placed into custody in 2011 for these crimes, but that the simple assault charge was "still … pending" at the time of the sentencing hearing. No additional information was offered about this charge. It is clear from the trial court's ruling that it did not consider this simple assault charge in sentencing the Defendant.

The trial court did apply this factor based upon the Defendant's commission of a "traffic offense." The presentence report reflects that the Defendant was charged with driving on a suspended license; however, the report further shows that that his charge was "nolled." In the comments from the presentence investigation officer, it is stated that this charge "is noted as a [second] offense" but that "no first offense was located in the [Defendant's] criminal history." No additional information about this charge or the "first offense" was presented.

A mere arrest is not "criminal behavior" relevant to sentencing and, therefore, cannot be considered by the sentencing court. State v. Newsome, 798 S.W.2d 542, 543 (Tenn. Crim. App. 1990). However, prior criminal behavior which was the basis of an arrest may be considered if it is established by a preponderance of the evidence. State v. Carico, 968 S.W.2d 280, 287 (Tenn. 1998). Moreover, "[t]he Act does not preclude consideration of facts proven by a preponderance of the evidence, even where the facts are the basis of a charge for which there has been an acquittal." State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000). In making its sentencing argument, the prosecutor stated, "As [the presentence investigation officer] testified and the court is aware of and has in its possession the pre-sentence report that shows that [the Defendant] has previous charges, but not previous convictions." We agree. None of the Defendant's criminal behavior was established by a preponderance of the evidence at the sentencing hearing, and therefore, this factor was not applicable to the Defendant.

Regarding enhancement factor (5), that "[t]he defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense[,]" the trial court applied this factor because a death resulted from the Defendant's actions. See Tenn. Code Ann. § 40-35-114(5). This enhancement factor requires a finding of cruelty over and above that inherently attendant to the crime. See State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001); see also State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App.

1995) (citation omitted) (holding that this factor was not applicable because there was no evidence that rape victim suffered greater injury than that ordinarily involved in the offense), overruled on other grounds by State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000). In other words, "'[e]xceptional cruelty,' when used as an enhancement factor, denotes the infliction of pain or suffering for its own sake or from gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." State v. Reid, 91 S.W.3d 247, 311 (Tenn. 2002).

In applying this factor, the trial court should state what actions, apart from the elements of the offense, constitute "exceptional cruelty." State v. Goodwin, 909 S.W.2d 35, 45-46 (Tenn. Crim. App. 1995). Here, the trial court applied this factor, concluding, "One may commit an aggravated child abuse, cause injury to a child which does not cause death. This caused death and I don't know of a greater injury that can be . . . brought upon another person." The aggravated child abuse statute provides that

> "[s]erious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

Tenn. Code Ann. § 39-15-402(d). We note that there was ample evidence of serious bodily injury—including subdural hematomas, subarachnoid bleeding, retinal hemorrhaging, cerebral edema, and brain contusions—apart from the evidence of the victim's death. See, e.g., State v. Rashii Brisbon, No. M2012-00671-CCA-R3-CD, 2013 WL 1087607, at *20 (Tenn. Crim. App. Mar. 13, 2013) (remarking that, while courts have concluded that application of factor (6)—the personal injuries inflicted upon the victim were particularly great—was improper when death constituted the serious bodily injury that was an element of the crime, there was ample evidence of other serious bodily injury—including subdural and retinal hemorrhages and brain edema—apart from the evidence of the victim's death in that case). Nonetheless, we cannot agree that the fact a victim of aggravated child abuse died, in and of itself, provides a sufficient basis to apply the exceptional cruelty factor.

Turning to enhancement factor (14), we agree with the trial court that the Defendant abused his position of trust as the victim's caretaker in a manner that significantly facilitated the commission or the fulfillment of the offense. See Tenn. Code Ann. § 40-35-114(14). The Defendant was listed as the victim's father on her birth certificate, and he "claimed [the victim] as his own[.]" He had married the victim's mother prior the victim's birth, despite the fact that the ceremony was not legally binding. "The position of parent, step-parent, babysitter, teacher, coach are but a few obvious

-45-

examples" of occupying a position of public or private trust. <u>State v. Gutierrez</u>, 5 S.W.3d 641, 645 (Tenn. 1999) (citing <u>State v. Kissinger</u>, 922 S.W.2d 482, 488 (Tenn. 1996)). Moreover, an adult "occupies a position of 'presumptive private trust' with respect to the minor" when the adult and child are members of the same household. <u>Id.</u> The Defendant was frequently alone with the victim, so the victim's mother could work. Prior to being left alone with the Defendant that evening, the victim had no visible injuries and was behaving normally. The record supports the trial court's application of this enhancement factor, and its decision to give it "great weight."

In the present case, the trial court properly considered enhancing the Defendant's aggravated child abuse sentence on the basis of the Defendant's position of trust with the victim, and the Defendant does not contend otherwise. The record further demonstrates that the trial court sentenced the Defendant in accordance with our Sentencing Act. A trial court's erroneous consideration of some enhancement factors, which are merely advisory, does not give this court grounds for reversal when the trial court otherwise conforms with the mandates of the Sentencing Act. <u>See</u> <u>Bise</u>, 380 S.W.3d at 709-10; <u>Carter</u>, 254 S.W.3d at 346. Accordingly, we cannot say that the Defendant has established that the trial court abused its discretion by enhancing his sentence to eighteen years for his aggravated child abuse conviction, and he is, therefore, not entitled to relief. <u>See, e.g.</u>, <u>State v. Richard Dickerson</u>, No. W2012-02283-CCA-R3-CD, 2014 WL 1102003, at *12 (Tenn. Crim. App. Mar. 19, 2014) (concluding that the trial court improperly considered two of three enhancement factors it applied but, nonetheless, otherwise conformed with the mandates of the Sentencing Act, so the defendant was not entitled to relief).

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments and sentence are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE